In re HEATHER APARTMENTS
LIMITED PARTNERSHIP,
Debtor.

No. 06–43101.

United States Bankruptcy Court,
D. Minnesota.

March 28, 2007.

James L. Baillie, Douglas W. Kassebaum, Faye Knowles, Ryan Murphy, Fredrikson & Byron, P.A., Minneapolis, MN, for Debtor.

## ORDER DENYING DEBTOR'S MOTION FOR EXTENSION OF TIME UNDER 11 U.S.C. § 362(d)(3)

GREGORY F. KISHEL, Chief United States Bankruptcy Judge.

This Chapter 11 case came on before the Court on March 26, 2007, for hearing on the Debtor's motion for an extension of time under 11 U.S.C. § 362(d)(3). The Debtor appeared by its attorneys, James L. Baillie and Ryan T. Murphy. Fannie Mae, a secured creditor, appeared by its attorney, Dennis M. Ryan. The City of Oklahoma City appeared by its attorney, Matthew R. Burton. Interstate Fire & Casualty Company appeared by its attorney, Jeffrey G. Tinkham. The following decision is based upon the motion and its supporting documents, the arguments of counsel, and the written record made for Fannie Mae's related motion for relief from stay.

The Debtor filed a voluntary petition under Chapter 11 on December 28, 2006. The Debtor is a Minnesota limited partnership that maintains its offices in Minneapolis. Its sole tangible asset is developed real estate in Oklahoma, a 436–unit apartment complex located just outside Oklahoma City in an incorporated municipality known as "The Village." The complex is operated under the name of "Vintage Lakes Apartments."

Fannie Mae, as assignee of EF & A Funding LLC, holds a mortgage against the Vintage Lakes Apartments, which secures substantial outstanding indebtedness of the Debtor. In submissions to the court, the Debtor has acknowledged that the balance of the debt was $6,968,682.58 plus attorney fees and costs, as of March 26, 2007. Fannie Mae commenced a foreclosure action against the Debtor in the Oklahoma state courts in early December, 2006. Upon the Debtor's Chapter 11 filing, Fannie Mae's prosecution of the foreclosure action was stayed by operation of 11 U.S.C. §§ 362(a)(1), (3), (4), and (5).

The Debtor concedes that the Vintage Lakes Apartments complex is "single asset real estate" within the Bankruptcy Code's definition.[1] Thus, the Debtor's continuing

---

1. Specifically, the Vintage Lakes Apartments complex is "real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the

protection under the automatic stay, as against Fannie Mae's efforts at foreclosure, is subject to 11 U.S.C. § 362(d)(3). That statute mandates a termination, annulment, modification, or conditioning of the stay unless,

> ... not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90–day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—
>
> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments that—
>
> (i) may, in the debtor's sole discretion, notwithstanding [11 U.S.C. § ] 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>
> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; ...

See *In re LDN Corp.*, 191 B.R. 320, 326 (Bankr.E.D.Va.1996) (applying pre-BAPCPA language of § 362(d)(3); noting that "[t]he unequivocal language of the statute mandates relief from stay" in case where debtor fails to meet conditions for maintenance of stay after first 90 days of bankruptcy case).

Seeking to forestall the imposition of those conditions and to defer any consequence of not meeting them, the debtor has made the motion at bar. Its authority is the statute's parenthetical alternative to its 90–day deadline for action.[2] Alleging that there is "cause" under § 362(d)(3) to do so, it seeks an extension of its day of reckoning to commence paying interest to Fannie Mae, until September 30, 2007.[3]

As is the case for so many amendments made to the Bankruptcy Code's text since the original 1978 legislation, Congress does not indicate what would constitute cause for such an extension.

■ At least in the context of bankruptcy, in the absence of an express definition or prescription, the courts should measure the existence of cause for excusing compliance, by referring to the purpose of the underlying statutory requirement. Cause then would consist of something extraordinary in the circumstances, something that

business of operating the real property and activities incidental." 11 U.S.C. § 101(51 B). (This definition was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8. This case was commenced after the effective date of BAPCPA, so the amended text of the definition is the one that applies here.)

2. The Debtor's motion was timely made so as to bring the issue of an extension before the court. The Debtor's voluntary petition on December 28, 2006 constituted an order for relief under Chapter 11, 11 U.S.C. § 302(a); thus, "the date that is 90 days after the entry

of the order for relief" is March 28, 2007, counting the days forward with December 29, 2006 as the first such day. This order is "entered within that 90–day period."

3. In the text of its motion, the Debtor made reference to the possibility that it would file a plan of reorganization. It then stated its intention to "seek a determination that the plan complies with § 362(d)(3)," i.e., that the plan had "a reasonable possibility of being confirmed within a reasonable time." No plan was on file when the parties submitted this motion. As a result, this alternative request for relief is not ripe.

tips the equities of a case outside the balance that Congress envisioned and then reinforced by establishing the underlying requirement. If the requirement on its face protects a specific constituency, the cause should incorporate a viable alternative to address that constituency's specified entitlement. Where the structure of a particular requirement of the Code markedly reflects such an intent (or an intent to hamper the general latitude that another constituency would enjoy under the Code's more free-ranging provisions), the party seeking a departure must directly respond to the legislative intent. In this light, for the establishment of cause, it is not sufficient to rely solely on the more global goals of bankruptcy relief, even if those might otherwise be served by excusing compliance with the requirement.

■ Unfortunately, the Debtor and its allies (two unsecured creditors) have only focused on the general bromides of bankruptcy. This is not enough to establish cause. Thus, the Debtor's motion must be denied.

This case bears almost all of the attributes of a "single-asset bankruptcy case," as that term gained its currency in the 1980s and 1990s. *See In re Kkemko, Inc.,* 181 B.R. 47, 50–51 (Bankr.S.D.Ohio 1995) (discussing origin and meaning of term "single-asset bankruptcy case," as understood in legal shorthand-parlance before 1994 enactment of § 362(d)(3)). While very precise findings cannot be made on the present development of the record, it is uncontroverted that the Vintage Lake Apartments complex is indeed a financially-troubled real estate development; its operation suffers from undercapitalization, deferred maintenance, and insufficient cash flow. The Debtor has admitted that the occupancy rate of the complex is significantly lower than desirable. More to the point, the current and predictable rental revenue stream from the property is not enough to meet regular expenses of operation, let alone any debt service to Fannie Mae.

For several months before the bankruptcy filing, the property was in play on the marketplace, subject to a purchase offer for a price of $13,000,000.00 that then evaporated in late 2006. The fate and future of the area surrounding the property is uncertain and it too is in play to some degree. In promotion of an extensive redevelopment from current uses, The Village established a tax increment financing district for the area, including the land on which the Vintage Lakes Apartments lie. However, the redevelopment has not gone ahead according to initial expectations. Certain actions of The Village that touched on the Debtor's place in the redevelopment scheme have prompted the Debtor to commence an inverse-condemnation action in the Oklahoma state courts.

To meet the current expenses of property management and operation for the first months of this case, the Debtor has had to rely on cash infusions from Andrew C. Grossman, the president of the Debtor's general partner, or artificial business entities related to Grossman or the Debtor.[4] To date, the amounts of these cash infusions have not been sufficient to meet the needs of current operations and to make debt service to Fannie Mae; thus, they have been directed toward the operating expenses. Absent an even larger cash infusion, the Debtor will be unable to make ongoing payments to Fannie Mae; it does not project an increase in occupancy large enough to raise revenues to an amount sufficient to fund such payments.[5]

---

4. This may have been going on for a while before the bankruptcy filing as well.

5. Some number of the complex's apartment units have been condemned by The Village's

By the very nature of the beast, by the occurrence of balance-sheet or operating insolvency in an economic entity of such particularized characteristics, nearly every "single-asset real estate" property that becomes subject to the bankruptcy process will bear most or all of these features. Most cases involve one major secured party holding a mortgage, assignment of rents, and other security protections typically required by the market for commercial real estate finance. And if the property is in the hands of a debtor-entity that acquired it in recent years, the debt owing to the secured creditor usually approaches, matches, or even exceeds the current market value of the property. From the mere happenstance of a financial foundering, nearly every such operation has a modicum of unsecured trade debt or more, sometimes up to several hundred thousand dollars in total but almost always dwarfed by the claim of the secured lender.

And, reflecting a late-coming realization of individual principals, there often are efforts to sell the distressed real estate, or present expressions of fervent commitment to market and sell the property to recover value from the illiquid form of an operating but insolvent real estate development. When such efforts are proffered in the context of a bankruptcy case, they are often accompanied by statements of a profound wish to recoup enough value to cover both secured and unsecured debts of the debtor—in order to meet the classical aspirations of bankruptcy, maximizing the value of distressed assets, and assuring a prioritized and rateable distribution of that value to all of the debtor's creditors.

In bankruptcy but outside a case involving single-asset real estate, these basic considerations do factor into a determination of "cause" for a departure from any requirement otherwise imposed on the debtor or the estate. In its generality, a typical history and structure of debts and assets matches the breadth of the Code's generally-applicable requirements of a debtor or a bankruptcy estate. In turn, the statutorily-embodied balance of equities to be considered is broader, more generic, and necessarily more malleable by the court. Thus, correspondingly less by way of special circumstances might be required to support a reallocation of burdens, in the service of a more free-flowing identification of fairness.

But that is not the statutory scheme here. Section 362(d)(3) gives very special deference to the mortgagee of single-asset real estate, in an express entitlement to receive payments of contractual interest from the debtor once the first 90 days of the case have passed. The only specific alternative available to the debtor-owner is to get the reorganization case pushed forward substantially by filing an arguably-confirmable plan within that first 90 days.

The legislative history for § 362(d)(3) is "meager." *In re Archway Apts., Ltd.*, 206 B.R. 463, 465 (Bankr. M.D.Tenn.1997). However, the terse extant history and the statute's own structure suggest that Congress was concerned about the relative unfairness of lengthy delay in Chapter 11 cases involving single-asset real estate projects, *In re LDN Corp.*, 191 B.R. at 326; that one of its

authorities, due to deteriorated physical condition, and they may not be rented absent remediation. The Debtor also alleges that the market attractiveness of rentals at the complex has been hampered by the publicized uncertainty of the property's status in The

Village's redevelopment effort. It attributes this problem to about-faces in position and commitment from the public officials responsible for promoting the redevelopment project.

goals aims to expedite the proposal of meritorious plans of reorganization in such cases, *In re Kkemko, Inc.,* 181 B.R. at 49; and that, where the case does not early kick forward toward confirmation, a debtor must compensate its mortgagee for the time-value of the mortgagee's debt investment, by the payment of interest at the original contractual rate.[6]

Under the present posture of this case, the entitlement under § 362(d)(3)(B) is the only one at issue. Its undeniable import is that any proffer of cause for excusing a debtor's compliance must include a concrete substitute for the creditor's statutorily-fixed expectation of payment, if the debtor is to be excused.

The Debtor's argument presupposes a sale of the Vintage Lakes Apartments, conducted by itself as debtor-in-possession, for an amount sufficient to pay off Fannie Mae's claim as it would stand when the sale is closed, and some additional increment to apply to unsecured claims and on down to the holders of ownership interests in the Debtor if there is enough. As to concrete facts, the Debtor's proposal is not much built out from there. This showing simply does not rise to the level of cause.

■ This is not to say that a prospective sale of single-asset real estate could never qualify as a concrete substitution for the ongoing realization in money via payments

of interest. However, if it were to be considered, the debtor should bear a heavy burden of production as to the *likelihood* that a sale will close promptly, and that there would be enough proceeds to serve the needs honored by the statute. At minimum, it seems, there should be a binding purchase agreement executed before the presentation of the motion under § 362(d)(3); a binding lending commitment in favor of the prospective purchaser; and demonstrated substantial progress in satisfying the ministerial minutiae for closing. Only then could a court feel assured that the protected mortgagee would receive a substantial equivalent of its expectancy under § 362(d)(3), so as to merit holding it off from foreclosing after the first 90 days of the case.[7]

Otherwise, properties would continue to languish underutilized in the possession of debtors unable to operate them in a state of solvency, for the unknown period of an airing for sale in the marketplace. The risk that the purchase price would be levered down by marketplace pressures would increase, the longer the property lay on the market; and this would further jeopardize the lender's presumptive right under § 362(d)(3), to receive value in-hand on an ongoing basis as the tradeoff for its continuing subjection to the automatic stay.

---

**6.** The third conclusion does not bear a case citation here, the published jurisprudence under § 362(d)(3) being almost as sparse as the legislative history. However, this point is the only one reasonably to be drawn from the language of the alternative under § 362(d)(3)(B).

**7.** One court declined to unqualifiedly grant a mortgagee's motion for relief from stay brought under § 362(d)(3), on the ground that the pendency of a court-authorized sale by a Chapter 7 trustee merited a conditional continuation of the automatic stay to allow the trustee to close the sale. *In re Planet 10, L.C.,*

213 B.R. 478 (Bankr.E.D.Va.1997). The *Planet 10* court addressed a very different procedural posture—after the expiration of the statute's 90–day period, and hence at a time when any consideration of deferring the estate's duty to pay interest was time-barred. And, in the last instance, that court used its power under the prefatory paragraph of § 362(d) to fine-tune the relief it was granting, even if the automatic stay would no longer lie generally and indefinitely. As a result, *Planet 10* is not really on-all-fours authority for the motion made here.

The Debtor here has no buyer in-hand, nearly ready to go forward. On the record accepted for this motion, the one possibility of sale involves an entity that no one to the case has identified to known individuals. That entity has only expressed an interest in purchasing the Vintage Lakes Apartments for $8,500,000.00, with a very broadly-phrased assurance that that entity had financing available—but no detail whatsoever. Though the Debtor's counsel termed this a "letter of intent," that cognomen is quite stretched over the very thin content of the one-page communication in the record. All told, this is no basis for concluding that the Vintage Lakes Apartments could be liquidated quickly and for an amount sufficient to satisfy all of the claims that the Debtor proposes to pay.

This motion comes out of a statutory matrix, § 362(d)(3), in which a grant of relief from stay in favor of a mortgagee against single-asset real estate is presumptive, unless the debtor gives its lender very specific things. The scope of considerations under §§ 362(d)(1)-(2) is much more broad; there, the existence of substantial equity in pledged collateral is usually the main concern, and its proven existence is readily accepted as protection of a mortgagee's financial interests while the automatic stay prevents it from foreclosing. Under § 362(d)(3), however, the focus is entirely on an *in-hand realization of cash* by the creditor, *during the pendency of the case,* while the property remains in the debtor's hands. If a debtor is to be excused from having to surrender that cash right away, it must demonstrate a very substantial likelihood that the creditor would receive an equivalent value from another source, quickly enough to minimize its risks of recovering the time value of money.

In structuring its case for this motion, however, this Debtor focused on the al-leged equity in the property, and sometimes more in an abstract. That simply does not respond to Congress's very specific concerns in enacting § 362(d)(3). Thus, the Debtor has not made out cause for a deferral of its obligation to commence making payments to Fannie Mae.

IT IS THEREFORE ORDERED that the Debtor's motion for an extension of the date by which it must commence making payments of interest to Fannie Mae pursuant to 11 U.S.C. § 362(d)(3) is denied.